May it please the court, Daniel Saval from Brown Runneck on behalf of the appellant. And do we reserve any time for rebuttal? Yes, we'd like to reserve three minutes for the court's indulgence. That's fine. Go ahead. Counsel, isn't this case just a straightforward application of LeBron decision? It's our position that it's not that the bankruptcy court below did not properly apply LeBron because it rested its decision primarily on the basis that the note holders did not act with an expectation of reimbursement. That is LeBron. I mean, the circuit split that you've talked about is that you got substantial contribution and then there is this gloss on it, you call it a gloss, put by our court, taken from, I guess, another circuit a few years before. And that is that if you're doing this for your own self-interest primarily, you can't make a 503B3D substantial contribution claim. If not, you can. And the court here said that, in effect, you're doing this for your own self-interest primarily and not for the purpose of benefiting the state primarily. And in that regard, under LeBron, you lose. How is this case any different than LeBron? Well, in this case, it's our contention that the court, as I mentioned, focused on expectation of reimbursement and also focused on the motivations of the note holders. But that's what LeBron says that you look to. And the reason for that, as we all know, is because the purpose, one of the primary policies in bankruptcy is to get money together for the purpose of paying creditors. The more money you have for the purpose of paying creditors, the better off you are in terms of the goal of bankruptcy. And in this case, it would be siphoning money off. Now, you can argue to an in-bank court, possibly, that you should go with the plain text of what 503b3 says, and it doesn't talk about anything relating to whether you have an iliomocenary intent or not. Therefore, the question is it comes down to substantial contribution. But in the meantime, LeBron says that you need two things done, and this court, in effect, made a finding that you did not act primarily in the interest of the estate. You acted primarily in your own self-interest. Your Honor. Which is allowed. It's legal. Respectfully, we don't believe that that was the focus of the court. You've got to tell me where the court somehow fell off the tracks here, then. Plus, I mean, we have a pretty rigorous standard of review here. It's clear error, which is not easy. It's kind of a high hill. It is our contention that the court below did not apply LeBron properly. First, going back to LeBron, I think the court was crystal clear that there are two elements of the test. Okay. Two elements of the test. Why don't we go through that, and then you tell us how it did not apply LeBron correctly. The first element of the test is whether there is an actual and demonstrable benefit to the estate, created by the creditor enacting. Okay. And it's our contention the bankruptcy court found that there was, in fact, a benefit to the estate. You got the so-called bad guy out of there. Correct. Okay. And then the second? And the second prong of the analysis that LeBron makes clear a court should be focused on is whether the act was designed to benefit others that would foreseeably be interested in the estate. The word motivation and the phraseology expectation of reimbursement, while it is set forth in language in LeBron, it was not the focus of the court. And if we look at the LeBron decision, we see that when the court was considering the facts of that case, the court noted that the movement who uncovered fraud and other indication of misdeeds by management of the debtor, that in pursuing his various actions, he did provide a benefit to the estate. But then remanded the case and specifically said that if it was true that, as it appeared to the court, that part of what the movement did was to take action, a pre-petition to rest control over the company, then that is not an activity that could be reimbursed because in that case, the benefit to the estate would be incidental to the action, which is to rest control over the company. So the court made a finding that the actions here were not designed, were designed primarily to serve your own interests. And therefore, if that's the case, then you can't make a 503B3D claim under LeBron. Respectfully, Your Honor, I don't believe the court made that specific finding that the act was not designed to benefit others who would be foreseeably interested in the estate. What did the court say on this point? Well, the court focused on a motivation. And if I refer to the transcript at various points, page – A-4 what? This is A-489. 489? What did it say on 489? The court said, I will tell you it's my impression that your clients had such a bloodlust for Mr. Young that would have proceeded to do what they did regardless of whether there was a benefit shared by others. That is focused on, in our view, what was motivating the creditors to act, and not on whether the act was designed to benefit others. And I think it would – I'm looking at page 495 and 496. Now, the court said on 495, well, you wouldn't deny your client saw it was indeed in their interest. The issue is whether it was solely for their benefit. It was incorrect. It should be primarily. It goes on to the next page, or at the bottom of page 495, the top of 496. Substantial contributions should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interest and which accordingly would have been undertaken absent an expectation of reimbursement from the estate. I mean, the thought here is that you pay your own way, and only if you make a substantial contribution can you ask for reimbursement. And our position, Your Honor, is that the focus of the substantial contribution statute in 503B, as well as under LeBron, focuses on what the creditor did, not why the creditor did what it did. And as we've mentioned in our briefing, both the Fifth and the Eleventh Circuits have noted that creditors are always self-motivated. And it's our position that- And that's why the test is primarily. Everybody wouldn't be doing it. The client wouldn't engage you if they didn't have an interest. There's no problem with that. But in order to be paid from the estate for the actions that you do that benefit the estate, you have to primarily be interested in something for others other than yourself. Funders of the evidence. And it's our contention that the court focused on motivation, as opposed to what the note holder set out to do. And it was clear, and it's undisputed- What word were you going to use besides motivation then? You said design primarily, but what word would you use to- What was the purpose of the trustee motion? What did the creditor set out to do? That's motivation, isn't it? Well, that gets to- Why did I do it? In other words, what impelled me to do it? In this case, there was something- Benefit for your client, which was to get this guy out of there. It was in the interest of all creditors of the estate to bring the trustee motion. And, in fact, the trustee motion was supported by various parties, and that's a point that we think the court did not provide appropriate weight to. And it really goes to our point that other parties stepped forward and said, this is a good thing for the estate. It will have benefit to our constituents. Otherwise, why would they have come forward? Including one of the appellees- So the court turns you down. The court recited ultimately correctly what the test is of LeBron, and you're saying that the court did not make a finding of fact that you were acting primarily in your own interest. Is that what you're saying? We submit that the applicable test that's made crystal clear in LeBron is whether the act is designed to benefit others. And the court articulated that test in the context of trying to decide, well, if there's a benefit to the estate, we want it to be-it needs to be substantial. And how is it substantial? It's substantial if it's direct and not incidental. Not incidental to other purpose. And the fact that the court- Sir, this judge all decided interrupting you. With all due respect, I think you have made a fairly good argument. If we were sitting ab initio as a district court, you have a high burden here. You have to show-you have to show that the finding by the magistrate was clearly erroneous. And I haven't heard anything that will convince-have convinced me that you've met your burden of showing by your argument that the court was clearly erroneous. And respectfully, Your Honor, it's our position that the court did not apply the correct test by focusing on expectation of reimbursement. As the court itself said, it said that it was an element of the test, and that's how the bankruptcy court characterized it. And I submit that is not what this court said in LeBron, because expectation of reimbursement doesn't say anything about whether a creditor was motivated to benefit others, even assuming that motivation was at issue in a substantial contribution. Well, the design primarily is to serve their own interest. I'm missing something. Isn't your argument that, look, I understand that the court's ruled against this. You need to understand that since this other circuit case came out and LeBron came out, there's circuits that have gone the other way. I'm asking you, court, to take it in back. Isn't that really what your argument should be? If this court were to decide that the bankruptcy court applied the correct test by seeking- I don't think there's much doubt that this court-the bankruptcy court applied the correct test. The question is, I thought what you initially were saying was that they shouldn't have made this finding because the finding was incorrect. And if the finding was correct, then I'm asking you to take it in back. That's not what you're saying? Our primary point is that the court can reverse the bankruptcy court- How? Based on its application of the incorrect standard. But also- Whoa, time out. What incorrect standard? What incorrect standard? Based on an expectation of reimbursement standard. But alternatively, as we did- I'm sorry. You expect to get reimbursed when you take the case from your client. You've done a mitzvah for the estate. And now you say, okay, let's go and seek a substantial contribution claim. You need to convince the court that you weren't acting in your own interest primarily, but that you were acting in the interest of the estate and others primarily. And the court said it didn't buy it. The court thought you were acting in your own interest. So what's the incorrect standard that the court applied? Well, as I mentioned before, the court was focused on motivations, and specifically it was occupied with this notion that the note holders were out for blood loss, that they had some ill motive, that there was tremendous amount of acrimony between the parties. Not a question of blood lust. It's a question of why did you act to try to get rid of this individual that you perceived not to be good for the purpose of the reorganization. Because the note, there's evidence that from the face of the trustee motion, as well as a statement of support from other parties that were representing different interests and different parts of the capital structure of this debtor, that it was something that should be done. And the note holders undertook an action that no other party, not even an estate compensated party, would do. All right. We'll hear from Mr. Brody, Mr. Johnson. When you get back on the rebuttal, one of the things I'd like you to address is how you have standing to request reimbursement on behalf of the bondholders from the land code debtors. Understood, Your Honor. Okay. Thank you. Mr. Brody. Good afternoon, Your Honor. Mark Brody, Latham & Watkins, LLP, on behalf of the Appalese Steering Committee of Senior Secured Lenders to Tropicana Entertainment. I think ultimately, Your Honor, we do have a fairly straightforward application of the LeBron standards. Judge Carey, at the end of his decision, this is on AO 533, was very clear in terms of the finding of fact that he made relative to this issue where he said that, quote, I am convinced that the action was taken largely in the self-interest of the move-in tier and would have been taken whether there would have been estate reimbursement or not. And I think Judge Carey chose those words very carefully. They track almost word-for-word the relevant standards set forth in LeBron as sort of the second part of the two-part standard. And what, in effect, the appellants are arguing is that the second part of the standard should sort of, in effect, be inferred from the first part of the standard. It's kind of like what Your Honors were dealing with a few minutes before, where intent should be inferred from other actions. They seem to be saying, well, the moment you have an action which benefits the estate as a whole, beyond the narrow interests of the move-ins, then, by definition, that means that there was a design to benefit those sort of conflating result with design as a way of getting around the clearly erroneous standard. And, Your Honor, we believe that Judge Carey properly applied LeBron, his findings of fact dovetail very closely to LeBron. What types of actions would qualify as transcending self-protection? Well, there's a few I can think of, Your Honor. I remember there was one of the cases, I forget whether it was Columbia Gas or Geriatrics Nursing Home, where there was a shareholder who felt that the current management of the company was improperly managing, came in, engaged in a lot of fact-finding, undertook a lot of effort, presented a bunch of information to the estate from which the estate could then move on to file causes of action. The estate wasn't solvent. There was no benefit to the shareholder. But the shareholder provided a real benefit that didn't come back to his personal benefit. Now, that kind of sounds almost messianic in a way. But I can also think of situations where the amount that's at stake for the particular creditor may have an impact on whether, in fact, substantial contribution is due. For example, the appellants owned several hundred million dollars of the bonds in question, and so were out there trying to protect a very sizable estate. This is Opco or Lanco? This is Opco, Your Honor. However, if the movement held, say, a few hundred thousand dollars instead of a few hundred million, such that the expense being incurred was vastly disproportionate to the amount of money that was being protected, you can start inferring more of a, not so much eleemosynary intent, but at least sort of beyond the simple self-interest of the creditor, looking for something that is, at a certain level, correct, as opposed to simply benefiting itself. And I think that you run a risk if you start moving beyond the two-part test of LeBron and start saying that, gee, the result dictates the outcome, as opposed to looking into motivations of having some unintended consequences. For example, this court, around a year ago, in the Reliant-Channelview case, affirmed its prior decision in O'Brien, applying a 503B1 standard to expense reimbursement and breakup fee. If you were to eliminate the motivation portion of the LeBron test, by definition, a losing stocking horse bidder has provided value to the estate. Does that mean that the losing bidder can come in, having been unable under O'Brien to get reimbursement for its expenses, come in and file a substantial contribution claim for all of the reasonable expenses incurred in putting together a stocking horse bid? It clearly provided benefit to the estate. Does that mean that it intended to do so? Almost certainly not. It was intending to buy the assets. Although I suppose you can conceive of a circumstance where that was, where you had a stocking horse, you went to a stocking horse who was a reluctant stocking horse, and the person in charge said, look, I don't want to do it, then ultimately says, okay, I'll tell you what, it might help you, it might benefit the estate, I'll do this as a stocking horse, but I'm doing it to help you out to get the monies up, and if that's the case, I'm hoping you all support me with respect to a substantial contribution. And that would get to the second part of the LeBron test. You know, if you had that evidence where people got up and said objectively, yes, we really had to drag them to the table, and the only reason they were willing to do this is because we all supported them, then you might very well, under the second part of the LeBron test, get a substantial contribution in that case. Do you know, does anyone have, even anecdotally, what the consequences have been in the Fifth and the Eleventh Circuits with regard to their decisions that you look at substantial contribution textually and it doesn't have any type of motivation prong? Have there been more substantial contribution claims filed and granted there than in the circuits like ours that don't have a single part test? Your Honor, I'm unaware of any sort of studies that academics or others may have done. A lot of these decisions, if not the vast majority of them, are not reported, not appealed, and absent going into the dockets of every single case and looking for these decisions, it would probably be an extremely difficult thing to do. Well, Judge Ambrose said anecdotally. I mean, I guess there's no real study out there. I mean, you come from a big firm. What's your experience? My experience, quite frankly, is primarily in the Third and Second Circuits. The vast majority of bankruptcies I work on are actually in the Third Circuit. So my experience is that it's an extremely difficult part. Has the Second Circuit adopted, gone one way or the other? Not to my knowledge. Not on a circuit level basis. So it's just four circuits. Mister, is it pronounced Brody? Brody, Your Honor. Brody, sir. Your friend was arguing that the district court used the wrong standard. First, I'm going to ask you, how do you understand what standard your friend was referring to? And if so, we get to that standard. What is the standard of review? You know, I am actually somewhat confused by my colleague's standard. You know, they speak a lot about Judge Carey focusing on expectation of reimbursement, which is certainly part of the second test in LeBron. The LeBron test is slightly broader than that, and Judge Carey has indicated in his findings, very closely tracked that second LeBron standard. As I understand it, Mister Savall is arguing that Judge Carey focused solely on, I guess, the second half of the sentence in question in LeBron, and in doing so lost sight of the first half of the sentence. But as I sort of read the argument put together, they're looking for more of a non-intent-driven analysis, that what matters is the result that had benefited everyone, as opposed to just benefiting themselves. And from that, 503B3 follows. Okay. The reason I ask is that, as I indicated earlier, I feel that what their chief complaint was, he called it an application of a wrong standard, but they were quarreling as to the actual factual finding that made by the district court, in which case the standard of review would be a high burden. The standard of review is clearly erroneous. And, Your Honor, I actually believe that the difference in standard is extremely important for just that reason. I believe that one of the primary purpose of the argument being made by the appellants is to try to take it away from the clearly erroneous standard to point to an incorrect legal conclusion that Judge Carey made, and therefore it will be subject to a de novo review. As I've indicated, we believe that Judge Carey was completely correct in his application of the law, and thus we are in a clearly erroneous standard of review. I agree with you. I agree with you on that. I guess, Your Honor, other than that, Your Honor, we do believe that Judge Carey properly applied LeBron. We think that LeBron and its second prong is important in maintaining a sort of agreement between the purposes of the statute, as Your Honor referred to, in terms of minimizing expenses and maximizing distribution, and thus respectfully request that this Court affirm the decision by the district court. Thank you very much. Thank you. Mr. Johnston, is there something you have to add to that or a different issue? Or if it's the same issue, I'm not sure there's a whole lot to add. Your Honor, I have two points to make unique to my clients. Just for the record, you better say your name. I'm sorry. For the record, and may it please the Court, I'm Jim Johnston of Dewey and LaBeouf on behalf of Tropicana Las Vegas and the liquidating land co-debtors. And we fully agree with the arguments Mr. Brody made this morning. There are two aspects of the case, I think, that are unique to my clients that I'd like to touch on just very briefly. And the first, Your Honor, you mentioned earlier in closing with Mr. Savall, which is we think the most important as to our clients, which is that the bondholder appellants do not have standing under the plain language of the Bankruptcy Code to make a fee request against my clients. And that's simply because the bondholders are not creditors of the land co-debtors. Their bonds were issued and guaranteed only by the op-co-debtors, and they have no claim at all against the land co-debtors or Tropicana Las Vegas. But we would still reach the merits with regard to the op-co-debtors. Correct. This is an argument specific and unique to land co-debtors. And if you start as we always have to. Are some of the consortium members creditors of the op-co-debtors? All of the consortium members are creditors of the op-co-debtors. Op-co-debtors. Are some of the consortium members creditors of the land co-debtors? No. They are bondholders. Their bonds were issued by op-co. They were not guaranteed by land co. And so if you look at the plain language of the statute, it permits allowance of substantial contribution fee claims for expenses incurred by, and I'll quote, a creditor, an indentured trustee, an equity security holder, or a committee representing creditors or equity security holders, unquote. As I just mentioned, the bondholders are not any of those things in relation to land co. They're not an indentured trustee. They're not an equity security holder. They're not a committee. And they're not creditors of the land co-debtors. And here, again, you can turn back to the plain language of the code, which specifically defines creditor as, quote, an entity that has a claim against the debtor, unquote. For purposes of Tropicana Las Vegas, the debtors are the land co-debtors. Because the bondholders have no claims against land co-debtors, they're not creditors within the plain meaning of the statute. And because they're not creditors, they have no right and no standing to seek substantial contribution payment from my clients. We cited a number of cases in our brief for this exact proposition. I'd refer the court to the Ninth Circuit's decision in Cellular 101, the Bankruptcy Court for the Southern District of New York in Olson, and a host of other courts from lower courts around the country. The only response we've gotten to date on the standing point is that this court should ignore the standing issue or should remand because the Bankruptcy Court and district courts did not need to address standing in actually addressing the merits. But this court can affirm on any available ground, and we did expressly argue and brief the point before both courts below. This is a pure question of statutory interpretation on undisputed facts, and there's no reason at all for a remand here. The Bankruptcy Court would be in no better position than this court to decide this standing issue. And frankly, a remand would be terribly prejudicial to my clients, who've had to incur very substantial fees dealing with this in the Bankruptcy Court and then the district court and then this court. Because there's no possible statutory basis for the relief requested as against my clients, we would ask this panel to affirm as to the LANCO debtors. The other point I wanted to make that is unique to LANCO, we think, which is that we submit that on this record, one cannot reasonably conclude that the bondholders made any contribution to the LANCO bankruptcy estates, much less a substantial one, much less whatever one may feel about their contribution to the OPCO estates. During the bankruptcy case... That would be your backup argument. That is our backup argument, absolutely, and it is fact-based. The LANCO debtors lost $20 million during the bankruptcy case after Mr. Young left. The cost to the bankruptcy estates just in dealing with this trustee motion was $2.5 million. Unsecured creditors in LANCO wound up with $400,000. Equity holders got nothing. There simply was no benefit accruing to my constituency from the motion that the bondholders brought. And we believe that that is, in itself, an independent ground on which this panel can affirm. Thank you very much. All right, thank you. Mr. Small. Thank you. First, turning to the standing issue, which I know Your Honor was interested in, from our perspective, we concede we're not a creditor of the LANCO estates. The reason that we thought it should be deferred to the bankruptcy court is because it really is an issue between the OPCO debtors and the LANCO debtors. But you have to be either a creditor or an equity security holder or something that's noted. You're none of those, are you? That is correct, and I'm prepared to concede that, Your Honor. Okay. I mean, I have no doubt you have standing as to OPCO. It's just that LANCO doesn't appear that you do. The reason we did not push that issue further is, again, because it was, from our perspective, an allocation issue, because if we otherwise met the substantial contribution standard, the leases to the OPCO estates, then we would be entitled to an award. Okay. Turning next to what's been discussed by the appellees about motivation, I think there's a case from the Southern District of New York that perhaps more aptly describes the basis of my appeal than I could, and that's a case called Bayou from the Bankruptcy Court of the Southern District of New York from last year. It's Judge Robert Drain, and was describing, and that's 431- What's the site? 431-BR-549, and the PIN site is 561-562. What does it say? Judge Drain canvassed the law of substantial contribution, canvassed the results, and came to this conclusion on the issue of when a creditor transcends self-interest. Judge Drain said this last consideration is relevant not because the creditor's mere motive should determine the outcome, rather it recognizes that Section 503B3 focuses on process as much as on contribution, and then goes on to say, and I think this is critical here, normally it is the job of professionals retained under the Bankruptcy Code as state professionals to ensure that the Chapter 11 cases proceed properly and efficiently, and he went on to note the majority of cases where a substantial contribution application were awarded or where a party transcended self-interest by taking on a leadership role, i.e., taking on a role that no other party, including an estate professional, took on, and that's exactly what our clients did, and that's what we submit LeBron stands for in the inquiry as to whether an act was designed to benefit others. In going to an example, which I think further helps explain, in response to the point that we're conflating the two prongs of the test, there certainly can be situations where a creditor provides a benefit, but the result could be incidental. There was discussion about a stocking horse bidder. Well, a stocking horse bidder, what it sets out to do is to acquire assets of the debtor at the lowest possible price, as opposed to the estate's interest, which is to sell the asset at the highest possible price. So that's an example where the stocking horse bidder, its interests are adverse to the debtor's, and therefore its actions can't be said to be designed to benefit others. And I think in this case, in stark contrast, the purpose of the trustee motion was to remove Mr. Young, and therefore it was designed to benefit others, and that's the test that we think should have been applied. All right. Thank you very much. Thank you to all counsel. We'll take the matter under advisement, and we'll call the next case.